# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINA M. REYNOLDS, on behalf of herself and all others similarly situated,<br><br>*Plaintiff,*<br>v.<br><br>TURNING POINT HOLDING COMPANY, LLC, *et al.*,<br><br>*Defendants*. | Case No. 2:19-cv-01935-JDW |

## MEMORANDUM

Christina Reynolds seeks to assert claims against entities based both in Pennsylvania and New Jersey. Although the entities all exist within the same corporate family, they remain separate, and the New Jersey entities lack the contacts with Pennsylvania that could subject them to personal jurisdiction here. The Court will therefore grant the pending Motion.

## I.  FACTS

### A.  The Turning Point Restaurants

The Turning Point is a chain of restaurants that serve breakfast and lunch meals. There are nineteen Turning Point restaurants: five in Pennsylvania; thirteen in New Jersey; and one in Delaware. Each individual restaurant is a separate limited liability company. Turning Point Holding Company ("TPHC") is incorporated in New Jersey and is the parent company and 100% stockholder of Turning Point of Pennsylvania ("TPPA"), Turning Point of New Jersey ("TPNJ"), and each Turning Point restaurant LLC. Defendant Kirk Ruoff is the CEO of all of the Turning Point entities, and, along with his wife, he is the majority shareholder of TPHC.

TPHC employs District Managers, each of whom oversees multiple Turning Point restaurants in New Jersey and Pennsylvania, and General Managers, each of whom oversees an

individual restaurant. It also handles the payroll for all employees of all Turning Point entities. Each Turning Point restaurant maintains its own bank account to handle deposits, but no payments are made from those accounts. Instead, TPHC controls and monitors the restaurants' bank accounts and determines when to transfer the cash from those accounts into payroll accounts that TPNJ and TPPA control. TPHC also handles all accounts payable and determines the vendors for each restaurant. Finally, TPHC handles the human resources and inventory for each restaurant and employs a culinary director who prepares the menu for all Turning Point restaurants.

TPNJ, which is incorporated in New Jersey, is responsible for hiring staff for each Turning Point restaurant. It also pays the employees of the individual New Jersey restaurants and is listed as the employer on each employee's W-2 form. Similarly, TPPA pays employees of the Pennsylvania restaurants, and employees of the Pennsylvania restaurants have TPPA listed as their employer on their W-2 forms. TPNJ and TPPA have no corporate employees. TPHC files a consolidated income tax return for all of the entities. TPNJ and TPPA file sales tax returns, which employees of TPHC prepare.

TPHC maintains a single website for the Turning Point entities, which also have a shared social media presence. The Turning Point website posts job positions at Turning Point entities and sells gift cards that can be used at any Turning Point restaurant. The Turning Point restaurants generally share the same hours of operation and use the same point of sale system. Additionally, the restaurants have interrelated operations and share the same employment policies. Individual restaurants will sometimes share employees or managers to make up for staff shortages. Certain employees of these restaurants, including servers, bussers, and baristas were paid in accordance with the "tip credit" provisions of federal and Pennsylvania wage-and-hour laws.

### B. Plaintiff's Work At The Turning Point Of North Wales

From March through July 2018, Ms. Reynolds worked as a server at the Turning Point restaurant in North Wales, Pennsylvania. During that time, the restaurant employed her and other servers, bussers, and baristas in a tipped capacity. Nevertheless, she performed some non-tip-generating work, particularly before the restaurant opened and after it closed. Ms. Reynolds recorded her work time by logging into the restaurant's timekeeping system through a point-of-sale system; however, no one instructed her to use a different job code when performing non-tip generating work or when working before or after hours. Ms. Reynolds believes Defendants' employment practices were common labor policies at each of their restaurants. She now seeks to bring a collective action claim for violations of the Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act ("PMWA") on behalf of herself and other employees who work or have worked at any Turning Point restaurant.

### C. Procedural History

On August 16, 2019, Ms. Reynolds filed an Amended Complaint in which she alleges four claims for violations of the FLSA and the PMWA on behalf of herself and all other tipped employees who work, or have worked, at the Turning Point restaurants. On August 26, 2019, Defendants filed a motion to dismiss in which they allege that this Court lacks personal jurisdiction over all Turning Point entities located outside of Pennsylvania. On September 9, 2019, Ms. Reynolds filed a response in opposition. In her response, she contends that the Court has both specific and general personal jurisdiction over the out-of-state Turning Point entities. On September 17, 2019, the Court entered an Order granting the Parties' stipulation to conduct jurisdictional discovery. Following that discovery, the parties filed supplemental memoranda addressing personal jurisdiction.

## II. LEGAL STANDARD

A federal court may assert jurisdiction over a nonresident of the forum state to the extent authorized by the law of the forum. *See* Fed. R. Civ. P. 4(k)(2). The Pennsylvania Long–Arm Statute grants jurisdiction coextensive with that permitted by the Due Process Clause of the Fourteenth Amendment, see 42 Pa. Cons.Stat.Ann § 5322(b), which in turn requires that nonresident defendants "have certain minimum contacts with [Pennsylvania] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the burden falls upon the plaintiff to establish jurisdiction. *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). If a defendant puts forth evidence demonstrating its lack of connection to a jurisdiction, a plaintiff cannot rely on the bare pleadings alone to satisfy her burden. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 n.6 (3d Cir. 2004). Instead, she must establish jurisdictional facts through sworn affidavits or other competent evidence. *See id.*

## III. ANALYSIS

In order to exercise personal jurisdiction, a court must possess either specific or general personal jurisdiction over each defendant. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009). A court may assert general jurisdiction if a company's contacts are so continuous and systematic as to render the company essentially at home in the forum state. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 914, 919 (2011). In contrast, specific jurisdiction depends on an affiliation between the forum and the underlying controversy. *See id.* Specific jurisdiction exists if the defendant has "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that

arise out of or relate to those activities." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009) (quote omitted). While general jurisdiction subjects a company to jurisdiction for all purposes, specific jurisdiction is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* Here, Ms. Reynolds posits a number of bases for the Court to assert personal jurisdiction over the New Jersey entities, some of which argue for specific jurisdiction, some of which argue for general jurisdiction, and some of which argue for both. The Court addresses each argument in turn.

### A. Alter Ego

Plaintiff argued in her initial opposition, and devotes all of her supplemental opposition, to her argument that the Turning Point entities are not really separate entities but that they are really all just alter egos of TPHC. Under the alter-ego theory, "if a subsidiary is 'merely the agent' of its parent corporation or the parent corporation 'controls' the subsidiary, 'then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary.'" *Lutz v. Rakuten, Inc.*, 376 F. Supp.3d 455, 470–71 (E.D. Pa. 2019) (quoting *Shuker v. Smith & Nephew*, PLC, 885 F.3d 760, 781 (3d Cir. 2018)). Here, because there is no dispute that Turning Point of North Wales is subject to general jurisdiction in Pennsylvania, then TPHC and other Turning Point entities would be as well if they are all alter-egos of each other.

The alter ego doctrine applies only if "the degree of control exercised by the parent is greater than normally associated with common ownership and directorship" and "**the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent**." *Action Mfg. Co. v. Simon Wrecking Co*., 375 F. Supp.2d 411, 422 (E.D. Pa. 2005) (citing *Directory Dividends, Inc. v. SBC Communications, Inc.*, 2003 WL 21961448, *3 (E.D. Pa. July 2, 2003)) (internal quotation marks omitted). Courts have noted

a "strong presumption" against piercing a corporate veil or deeming companies alter-egos of each other. *See, e.g.., In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-md-2445, 2017 WL 4810801, at *11 (E.D. Pa. Oct. 25, 2017).

Courts in this district consider ten factors in determining whether a subsidiary is the alter ego of its parent: "(1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and (10) receipt by the officers of the related corporation of instruction from the principal corporation." *Lutz*, 376 F. Supp.3d at 471 (quote and citations omitted). These factors are best viewed as a non-exclusive guide to help resolve the broader issue of whether the companies have a 'single functional and organic identity.'" *Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 676 (E.D. Pa. 2005). Accordingly, "no one aspect of the relationship between two corporations unilaterally disposes of the analysis, and the court may consider any evidence bearing on the corporations' functional interrelationship." *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 598 (M.D. Pa. 2009).

Here, some of these factors point towards a finding of alter-ego. TPHC and other Turning Point entities have common ownership, common directors and officers, and a common use of a trademark or logo. However, the fact that a company "is portrayed as a single brand to the public . . . does not demonstrate the necessary control by defendant parent over the subsidiaries." *In re*

*Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012). Similarly, the fact that District Managers supervise the individual restaurants or that TPHC maintains payroll is immaterial because the "level of control necessary to substantiate an alter ego relationship must exceed the usual supervision that a parent exercises over a subsidiary." *Simeone*, 360 F.Supp.2d at 675; *see also In re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001) (concluding that the mere "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" do not establish an alter ego relationship ) (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)).

Moreover, other factors tilt the other way. The Turning Point entities do not have an integrated sales system, common employees, or managerial and supervisory personnel. Indeed, Ms. Reynolds admits that the restaurants have their own managerial personnel and staff who "control the day-to-day ground level operations for the individual restaurants." (ECF No. 29 at. 2.) Moreover, there is no evidence that any of the Turning Point entities performs functions for another that the other should ordinarily perform for itself or acts as a marketing arm for a principal corporation. Each restaurant has a General Manager who is responsible for, among other things, allocating the budget, ordering food and other supplies from vendors, and enforcing employment policies. The General Manager retains discretion to deviate from company-wide policies if necessary. For instance, one restaurant has adopted its own opening hours and implemented changes to the menu based on its distinct clientele.

Ultimately, the Court concludes that Ms. Reynolds has demonstrated that the Turning Point entities operate as a single brand with common corporate control. That, however, is not enough to overcome the presumption that wholly-owned subsidiaries are separate and distinct from their

parent companies. *See Clark v. Matsushita Elec. Indus. Co.*, 811 F. Supp. 1061, 1067 (M.D. Pa. 1993) (citing *Cannon Mfg. Co. v. Cudahy Parking Co.*, 267 U.S. 333 (1925)).

      **B.**      **The Turning Point Website**

The Turning Point website does not subject any out-of-state entity to specific or general personal jurisdiction in Pennsylvania. The activity on the website is not related closely enough to the activity at issue in this case. The sale of gift cards has nothing to do with Ms. Reynolds' claims about her underpaid wages. Postings for job openings and Ms. Reynolds claims both relate to the Turning Point human relations function, but they are not the same conduct, and they are not so related as to give rise to specific personal jurisdiction because Ms. Reynolds' alleged harm does not flow from Turning Point's hiring procedures. Nothing in the record suggests that Turning Point's website has any connection to its pay practices.

The website also does not subject any out-of-state Turning Point entity to general jurisdiction in Pennsylvania. Operating a website through which customers can order products does not, on its own, suffice to establish general jurisdiction. *See TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp.2d 571, 592 (E.D. Pa. 2012) ("To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state."); *Wilson v. RIU Hotels & Resorts*, No. 10–7144, 2011 WL 3241386, at *8 (E.D. Pa. July 29, 2011) ("Maintenance of a website which allows users to reserve accommodations at Defendant's resorts does not demonstrate that [defendant] has systematic and continuous contact with Pennsylvania"). However, even if operating a website were sufficient to establish general jurisdiction, Plaintiffs have not provided evidence of a single interaction between the website and a Pennsylvania resident. Accordingly, Plaintiffs have failed to meet their burden of showing that the contacts

between the website and forum "are so 'continuous and systematic' as to render" any out-of-state Turning Point entity essentially at home in Pennsylvania. *Goodyear,* 564 U.S at 919.

### C. TPNJ

Ms. Reynolds makes two arguments regarding TPNJ, one for the exercise of general jurisdiction and one for the exercise of specific jurisdiction. Both fail.

#### 1. Business registration in Pennsylvania

Ms. Reynolds contends that TPNJ is subject to general personal jurisdiction in the Commonwealth because it is registered to do business in Pennsylvania as a foreign business. Pennsylvania law provides that when a foreign business registers to do business in Pennsylvania, it consents to general jurisdiction in the state. 42 Pa.C.S.A. § 5301. There is substantial debate about whether this statute is constitutional. The Third Circuit held in 1991 that the statute comports with due process. *See Bane v. Netlink, Inc.*, 925 F.2d 637, 639 (3d Cir. 1991). More recently, however, the Supreme Court has held that general personal jurisdiction exists only when "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quotes omitted). Since then, some courts have held that the statute still comports with due process. *See, e.g., Sciortino v. Jarden*, Inc., 395 F. Supp.3d 429, 431 (E.D. Pa. 2019); *Bors v. Johnson & Johnson*, 208 F. Supp.3d 648 (E.D. Pa. 2016); *Gorton v. Air & Liquid Sys. Corp*., 303 F. Supp.3d 278 (M.D. Pa. 2018). Other courts disagree. *See In re Asbestos Prod. Liab. Litig. (No. VI)*, 384 F. Supp.3d 532, 537 (E.D. Pa. 2019); *AstraZeneca AB v. Mylan Pharm., Inc*., 72 F.Supp.3d 549, 556 (D. Del. 2014); *Spear v. Marriott Hotel Servs*., Inc., No. 15-CV-6447, 2016 WL 194071, at *2 (E.D. Pa. Jan. 15, 2016).

The parties do not tackle this complicated issue. Instead, Ms. Reynolds argues in a couple sentences that TPNJ is subject to general jurisdiction because it registered to do business. Turning Point does not address it at all. However, having reviewed the decisions cited above, this Court agrees with and adopts as its own Judge Robreno's analysis in *In re Asbestos*. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 537 (E.D. Pa. 2019). The Pennsylvania statutory scheme requiring foreign corporations to consent to general personal jurisdiction in Pennsylvania by virtue of registering to do business here violates the Due Process Clause. Therefore, the Court does not have general personal jurisdiction over TPNJ.

### 2. Hiring and training

Pennsylvania's long-arm statute provides that personal jurisdiction extends to any person who causes "harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth." 42 Pa. C.S. § 5322(a)(4). Based on this statute, Ms. Reynolds argues that this Court has specific jurisdiction over TPNJ based on its role in hiring and training General Managers and overseeing staff hiring for Turning Point entities. None of that conduct gives rise to specific jurisdiction, however.

The harm at issue—the failure to pay wages properly—does not stem from TPNJ's acts or omissions. TPNJ did not pay Ms. Reynolds' wages; TPPA did, at least according to her W-2. Thus, while TPPA might face liability, TPNJ does not. In contrast, Ms. Reynolds' claims are not about the training or the way that staff was hired. While those facts might be atmospheric, they do not give rise to Ms. Reynolds' claims. They therefore cannot form a basis for specific jurisdiction.

## IV. CONCLUSION

Ms. Reynolds has not shown that the out-of-state Turning Point entities are subject to specific or general personal jurisdiction in Pennsylvania. Therefore, the Court will grant the motion and dismiss the out-of-state Turning Point entities. An appropriate Order follows.

BY THE COURT:

/s/ Joshua D. Wolson
JOSHUA D. WOLSON

February 26, 2020