**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHRISTINA M. REYNOLDS, et al.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**TURNING POINT HOLDING COMPANY, LLC, et al.,**<br><br>*Defendants.* | Case No. 2:19-cv-01935-JDW |

## MEMORANDUM

Restaurants often require servers to do more than serve. "If you got time to lean, you got time to clean, buddy," as one mantra puts it.[1] The problem with that mantra is that the law allows restaurants to pay servers and other tipped employees less than minimum wage and to let them make up the difference in tips. But it has to tell them first that they will be paid that way, and it has to limit the amount of time that they spend performing non-tipped work so that they can make enough money. If a restaurant makes a server clean (or do other non-tipped work) whenever she has a moment to lean, it gets a lot of work at a very cheap wage. Sometimes too much.

Christina Reynolds claims that's what happened to her. She worked at a Turning Point restaurant as a server. She says that Turning Point never told her or other tipped employees that it would take a tip credit for the tips she earned and pay her a very low minimum wage. She also says that Turning Point required servers and other tipped employees to perform too much untipped work on the side without paying

---

[1] Reality Bites (Universal Pictures 1994).

them a full minimum wage for that time. She seeks to represent a class of similarly situated workers.

As the Court explains below, Ms. Reynolds has mustered evidence that creates a factual dispute about whether Turning Point gave her notice of the tip credit. As a result, Turning Point might have underpaid her for every hour she worked. But the factual evidence she has is, in many respects, unique to her. Other employees might have had similar experiences, but there is no way to know without asking each of them. The individual nature of that inquiry means that this case is not appropriate for class action treatment for Ms. Reynolds' PMWA claim. Ms. Reynolds does have evidence that Turning Point's practices concerning side work were similar for all tipped employees at all of its Pennsylvania locations. So those claims are appropriate for conditional certification under the FLSA. Claims about the notice that each employee received are not appropriate for conditional certification, though.

## I.   BACKGROUND

### A.   The Turning Point Entities

Turning Point Holding Company, LLC is the holding company for several entities that operate five Turning Point restaurants in Pennsylvania: (a) Turning Point of North Wales, LLC; (b) Turning Point of Blue Bell, LLC; (c) Turning Point of Warrington, LLC; (d) Turning Point of Bryn Mawr, LLC; and (e) Turning Point of Newtown, LLC. (The Court refers to all of these entities, collectively, as "Turning Point.") Turning Point Holding Company provides various administrative services to all Turning Point restaurants, "including creating employment policies, administering

payroll, providing marketing support, finance and administration and some Human Resource related functions." (ECF No. 59 ¶ 5.)

All Turning Point locations employ tipped employees, and they have a common policy regarding compensation and tipping. Most tipped employees receive a minimum wage of $2.83 an hour and are partially compensated with tips from customers. (Certified baristas receive a higher minimum wage.) All Turning Point locations have a mandatory "tip out" policy, under which servers must tip out bussers and baristas. These locations also utilize a tip pool. Employees receive pay stubs that detail their compensation for each week worked, including wages and tips earned.

Employees at all Turning Point locations record their work time through the Aloha Point of Sales system. Employees record their work in Aloha using different job codes. Servers work under one job code. When they are in training at a restaurant, they clock in under a different job code, and Turning Point pays them the full minimum wage of $7.25, rather than the lower minimum wage applicable to tipped employees.

Turning Point trained its managers about tip credits under both the FLSA and the PMWA. It also provided many, but not all, managers with a Manager-in-Training Workbook that provided information about the tip credit provision. Turning Point then instructs its managers to tell new employees about the tip credit provisions in the relevant statutes. But Turning Point does not require managers to record whether and when they provide notice about the tip credit to new employees. Turning Point also hangs posters in employee-areas of its restaurants that address various employee-related notice, but it has not produced copies of those posters. Turning Point also

gives new employees a "server orientation packet," but there is no evidence that that packet addressed the tip credit.

### B.   Ms. Reynolds's Work For Turning Point

Ms. Reynolds worked as a server at the Turning Point location in North Wales, Pennsylvania, for approximately four months, from March 13, 2018, until July 15, 2018. When Turning Point hired Ms. Reynolds, she understood that tips would make up part of her compensation, but she only knew this because friends who worked in the restaurant industry told her as much. She denies that Turning Point ever explained the compensation structure to her or that it was taking the tip credit.

Normally, Turning Point used an online portal to onboard new employees. That portal provided employees notice that Turning Point would take a tip credit as part of the employee's compensation, and it required the employee to acknowledge receipt of that notice. Ms. Reynolds testified that she did not receive notice of the tip credit through the portal, and Turning Point has not produced evidence that she did. For purposes of these motions, the Court therefore assumes that Ms. Reynolds did not receive notice through the online portal. Apparently, that makes her an outlier, as Turning Point has written confirmation for most tipped employees. Like all new employees, Ms. Reynolds received training from a manager when she started with Turning Point. That training covered how she would perform her job, but there is no evidence that any manager told her about the tip credit.

As a server, Ms. Reynolds' primary responsibilities were waiting tables, attending to customers, placing orders, and delivering food. In that role, she made at least $200 in tips every week that she worked, and some weeks she made more than

$300. In addition to working in her primary role as a server, Turning Point required Ms. Reynolds and other tipped employees to do what the parties call "side work," meaning non-tip-generating work such as cleaning and setting tables, brewing coffee, bussing and running food, restocking condiments, rolling silverware, sweeping and mopping, doing dishes, and cleaning the bathroom. At each location, Turning Point had lists of weekly side work that servers had to complete. Side work duties meant servers might have to arrive at the restaurant 30 minutes before it opened or stay two-and-a-half hours after closing. Turning Point did not have a formal mechanism for tracking how much time a server spent performing side work. Turning Point expected its managers to intervene if an employee's side work was taking longer than expected.

Turning Point provided pay stubs to Ms. Reynolds, which disclosed the wage Turning Point was paying her as well as tips she received during that pay period. Although the pay stubs disclose an hourly wage of $2.83, they do not state that Turning Point was taking the tip credit.

### C.   Procedural History

On August 16, 2019, Ms. Reynolds filed an Amended Complaint in which she alleges four claims for violations of the FLSA and the PMWA on behalf of herself and all other tipped employees who work, or have worked, at all Turning Point locations. On February 27, 2020, the Court dismissed all non-Pennsylvania Defendant entities. On July 2, 2020, Turning Point filed a Motion for Summary Judgment, and Ms. Reynolds filed a Motion for Partial Summary Judgment, a Motion to Certify a Class Pursuant to Fed. R. Civ. P. 23, and a Motion to Conditionally Certify Collective Class Pursuant to

29 U.S.C. § 216(b). Turning Point then filed a Motion to Strike Ms. Reynolds' summary judgment motion. All of the motions are ripe for decision.

In her class certification motion, Ms. Reynolds proposes a class as follows: "All current and former Tipped Employees who have worked for Defendants in the Commonwealth of Pennsylvania at their Turning Point restaurant locations during the statutory period covered by this Complaint and who do not opt-out of this action." (ECF No. 48-1 at 13.) Plaintiff's motion for conditional certification does not include a class definition. In her conditional certification motion, she does not propose an express class definition, but she does ask the Court to conditionally certify "a collective class of all Tipped Employees employed by Defendants at their Turning Point Restaurants in Pennsylvania from May 3, 2016 to the present." (ECF No. 49-1 at 17.)

## II.   ANALYSIS

### A.   Motion to strike

Federal Rule of Civil Procedure 23(c) directs courts to rule on class certification at "an early practicable time." Fed. R. Civ. P. 23(c)(1). This direction springs, at least in part, from an intent to avoid problems of one-way intervention, in which a member of a putative class sits on the sidelines and waits for a summary judgment ruling before deciding whether to opt out of the class. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 545-47 (1974). While Rule 23(c)(1) gives a court flexibility to delay a class certification decision until it rules on summary judgment, Rule 23 "still disfavors one-way intervention and counsels against a court ruling on motions that encroach on the

merits of a final decision before class certification." *Koehler v. USAA Cas. Ins. Co.*, Civ. A. No. 19-715, 2019 WL 4447623, at * 5 (E.D. Pa. Sept. 17, 2019).

The rule against one-way intervention protects defendants from a summary judgment decision that does not provide mutual collateral estoppel. A defendant can waive that protection and choose to seek summary judgment before class certification. If it does so, it accepts the risk that the decision will not bind absent members of the putative class. *See, e.g.*, *Higgins v. Bayada Home Healthcare, Inc.*, 2020 WL 2512989, at *2 (M.D. Pa. May 15, 2020) (where defendant asked to file a motion for summary judgment before the class ruling, the defendant "is expressly waiving this protection by requesting leave to file a merits motion prior to class certification."); *Koehler*, 2019 WL 4447623, at *4 (one-way intervention doctrine "may be waived by a defendant who agrees to a pre-certification merits ruling."); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 762 (3d Cir. 1974) ("[W]here [a defendant] . . . is willing to run the risk that the determination of liability, if he loses, will be given effect in favor of the class, with notice in the event of such determination, the district court must seriously consider that alternative, and should, absent other compelling circumstances, pursue that course [of ruling on the merits].").

When Turning Point filed its summary judgment motion, it waived the protection of the one-way intervention doctrine for issues that it raised in its summary judgment motion. It cannot now invoke that doctrine to bar Ms. Reynolds' motion on the same issues. Ms. Reynolds' argument that Turning Point did not comply with the notice requirements for tipped employees under the FLSA and PMWA overlaps with Turning Point's motion, which contends that it did not violate those statutes. While it

might be the case that Turning Point is only seeking summary judgment on Ms. Reynolds' claims, the fact remains that Turning Point has put before the Court the question of whether Turning Point complied with the FLSA's notice provision. The Court has no basis to bar Ms. Reynolds from raising the same issue. In any event, given the outcome of the summary judgment and class certification motions, Turning Point will not suffer any prejudice from the Court considering Ms. Reynolds' arguments about the notice provision.

Ms. Reynolds's argument that Turning Point did not comply with the recordkeeping requirements of the statutes is another matter. Turning Point does not address this argument in its motion for summary judgment, so it has not waived the protection of the one-way intervention doctrine. If the Court ruled on this issue before class certification, it could prejudice Turning Point because members of the putative class would have a free look at the Court's thinking on the issue. The Court will therefore strike the portion of Ms. Reynolds's summary judgment motion that discusses Turning Point's compliance with the recordkeeping requirements.

**B.     Summary Judgment**

**1.     Legal standard**

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotations omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

The filing of cross-motions for summary judgment does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (citation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), aff'd, 435 F.3d 431 (3d Cir. 2006).

### 2.   Standing

FLSA Section 203(m)(2) only permits an employer to take a tip credit if the employer has informed the employee about the tip credit and permits the employee to retain all tips (other than those paid into a tip pool). *See* 29 U.S.C. § 203(m). The PMWA has similar notice requirements, which are interpreted coextensively with the

FLSA. *See* 43 P.S. § 333.103(d); 34 Pa. Code § 231.101(b); *Rui Tong v. Henderson Kitchen Inc.*, 2018 WL 4961622, at *3 (E.D. Pa. Oct. 12, 2018). If an employer does not provide such notice, then it cannot claim a tip credit, and it must pay its employees the full minimum wage and overtime that the FLSA requires. When an employer does not comport with Section 203(m) of the FLSA "the district court may not equitably reduce liability for back wages to account for tips actually received." *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994).

Ms. Reynolds has standing to assert her claims, contrary to Turning Point's argument. She does not claim only a technical violation of the FLSA. If Turning Point did not provide her with the notice that the FLSA required, then Turning Point had to pay her more than it did. That financial injury creates standing. Although Turning Point points to the tips that Ms. Reynolds received, those tips are not relevant to the standing analysis because Turning Point did not pay those tips to Ms. Reynolds. Customers did. In the absence of a notice that authorized the tip credit, the FLSA not only required that employees like Ms. Reynolds **receive** a minimum wage but also that employers like Turning Point **pay** a minimum wage. *See* 29 U.S.C. §§ 206. If Turning Point didn't do so, then it owes Ms. Reynolds money. This case is therefore not like *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), because it involves more than just a procedural violation; it involves financial harm.

### 3.    Turning Point's compliance

Material disputes exist about whether Turning Point provided Ms. Reynolds with the required notice to invoke the tip credit. Instead, it asks the Court to presume

that she got notice, but the Court cannot do so, based either on testimony about the contents of documents or based on Turning Point's standard processes.

Turning Point claims the posters that it hung provided the required notice. The Court does not know the contents of those posters, so it cannot rely on them as a source of notice. Turning Point did not produce the posters in discovery. Instead it offers testimony about what was on them. Federal Rule of Evidence 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Because Turning Point did not provide admissible evidence of the posters' contents, the Court cannot consider them.

Turning Point also points to internal processes that it claims should have led to Ms. Reynolds receiving notice. But in each case, the Court would have to make a logical leap, which would give Turning Point, rather than Ms. Reynolds, the benefit of the inferences. First, Turning Point points to its electronic system to onboard new employees, which includes notification and employee acknowledgement of the tip credit. Ms. Reynolds says she did not get that notice. Turning Point has not offered written evidence that might contradict her testimony.

Second, Turning Point educated new managers about the tip credit provision and other relevant labor laws and instructed them to tell employees about the tip credit. However, it did not have a policy of recording whether managers actually told the employee about the tip credit. So there is no record that any manager told Ms. Reynolds about the tip credit. Nor did Turning Point offer testimony from a manager who remembers giving Ms. Reynolds notice of the tip credit.

Third, Turning Point points out that Ms. Reynolds' pay stubs provided detail on the amount of wages that Turning Point paid to Ms. Reynolds and the amount of tips she received from customers. But nothing on those pay stubs notifies Ms. Reynolds that Turning Point was taking a tip credit. She would have to infer it, which is not enough to provide legal notice of the tip credit. *See Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 31 (1st Cir. 2014); *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 682 (D. Md. 2012) (concluding that employee earning statements that did not contain reference to the federal minimum wage were insufficient to inform employees of the tip credit). Without explicit notice, the Court cannot say that Ms. Reynolds would have known Turning Point was taking the tip credit.

Finally, Turning Point cannot rely on Ms. Reynolds' co-workers, friends, and family to have informed her that Turning Point was taking a tip credit. The tip credit notification is a "firm" requirement. *Reich*, 28 F.3d at 403-404. And the FLSA requires the **employer** to provide the notice. 29 U.S.C. § 203(m); *see also Perez*, 769 F.3d at 31 ("The FLSA requires that employees be informed by their employer that the employer intends to treat tips as satisfying a portion of the minimum wage.").

If Ms. Reynolds did not receive notice, then Turning Point cannot take a tip credit for any hour that she worked. As a result, the Court need not address the separate question of whether Ms. Reynolds performed side work for which Turning Point could not claim the tip credit because Ms. Reynolds' claim about those hours will survive in any event. However, the Court notes that there are disputed facts about how many hours Ms. Reynolds had to work and whether they exceeded a relevant

12

threshold (be it 20% of her hours worked or a reasonable amount of her hours worked).

### C.    Class Certification

Courts determine whether class certification is appropriate by conducting a two-step analysis: (1) whether the putative class has satisfied the requirements of Rule 23(a); and (2) whether the requirements of Rule 23(b) have been met. *See Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 124–25 (3d Cir. 2018). Rule 23(a) requires a plaintiff to establish: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). If a claim satisfies those four requirements, a plaintiff must then satisfy one subsection of Rule 23(b). Pursuant to Rule 23(b)(3), certification is appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that class action is superior to the other available methods for fairly and efficiently adjudicating the controversy."

When conducting this analysis, a court must be careful not to certify a class "casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D. Pa. 2015). Instead, class "certification is proper only if the trial court is satisfied, after a rigorous analysis" that all of the necessary requirements have been fulfilled. *Ferreras v. American Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (*citing Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). A rigorous analysis requires that factual

determinations be made by a preponderance of the evidence. *See id.* This inquiry will at times require a court to examine issues that overlap, to some extent, with issues left for the final merits determination. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). However, the Court should only engage in this overlapping analysis to the extent necessary to resolve the class certification motion, and no more. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

### 1.    Numerosity

The proposed class has approximately 300 members. That number satisfies the numerosity requirement. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012). Turning Point does not argue otherwise.

### 2.    Commonality

The commonality requirement is met when the proposed class members share at least one common question of law or fact and "is informed by the defendant's conduct as to all class members." *Sullivan v. DB Invs.*, 667 F.3d 273, 297 (3d Cir. 2011). The proposed class members share a common question of law, such as whether Turning Point had a legal basis to claim a tip credit. They also share common questions of fact, such as whether Turning Point required them to perform too much side work or provided them sufficient notice of the tip credit. Ms. Reynolds has satisfied the commonality requirement. *See, e.g.*, *Carr v. Flowers Foods, Inc.*, 2019 WL 2027299, at *9 (E.D. Pa. May 7, 2019) (commonality existed for class members who were employed in the same positions and subject to the same employment policies).

### 3. Typicality

Typicality is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement screens out class actions in which the legal or factual position of the representatives is different from that of the other members of the class even though there are common issues of fact or law. *See Marcus*, 687 F.3d at 598 ("If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class."); *Carr*, 2019 WL 2027299, at *9 (typicality met where named plaintiff and class members advanced the same legal claims and "there [was] no indication that their claims [were] in any way antagonistic to other members of the class").

Ms. Reynolds' claims about the notice of the tip credit are not typical of the class she seeks to represent. There is no electronic record that Ms. Reynolds received a notice of the tip credit from Turning Point's onboarding portal. That puts her in an atypical position compared to most of Turning Point's other employees, for whom there is a record. On the other hand, Ms. Reynolds' claims about performing side work are typical of the class she proposes to represent. Turning Point took a tip credit for each member of the class, each member had to perform untipped side work that allegedly exceeded the limited side work that the FLSA allows, and each member was supposedly underpaid as a result, just like Ms. Reynolds.

### 4.   Adequacy

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two prongs to this element: (1) the qualifications of the counsel to represent the class; and (2) whether there are any conflicts of interest between the named party and the class they seek to represent. *See, e.g.*, *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001) (holding adequacy was met because "counsel would suitably represent the class and . . . there [were] no foreseeable conflicts between the named representatives and the class they seek to represent that would bar certification").

Plaintiff's counsel is qualified and adequate. Turning Point does not argue otherwise. In addition, Ms. Reynolds satisfies the adequacy requirement as a class representative. She asserts claims common to the class and has no obvious conflicts of interest. Even if there are aspects of the claim that she cannot articulate or details with which she is not familiar, that does not undermine her adequacy. Class representatives do not have to be virtual lawyers to be adequate.

### 5.   Predominance

Predominance requires the Court to find "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Courts must scrutinize whether questions are common or individual and the relation among those questions. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). An individual question is one where members of a proposed class will need to present evidence that varies from member

to member. *See id.* A common question is one where "the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to be generalized, class-wide proof." *Id.* "To assess whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by the putative class are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018). This analysis requires the Court to "examine the essential elements of [the] claims on behalf of the . . . [c]lass, as well as the evidence they propose to use." *Id.*

Individual issues predominate over the common issues and render class certification improper. First, there are individual questions about whether potential class members received notice, including whether (a) Turning Point used its electronic onboarding process and can provide an electronic receipt of notice and (b) a Turning Point manager told a new employee that Turning Point took a tip credit and that the employee's compensation came in significant part from tips. The answers to those questions are not susceptible to common proof. They require an inquiry of each class member's hiring and onboarding experience.

Second, there are individual questions about whether each class member performed too much untipped side work. Ms. Reynolds's own proof demonstrates the individualized nature of the inquiry. She does not rely on written records or objective measures. Instead, she relies on her own testimony about what she did and the side work managers typically assigned to her. Other class members would have to tell their own, comparable tales to establish Turning Point's liability. And there is

17

evidence that some class members tried to avoid side work by staying in the front of the house, where they could earn more tips. Because the Court concludes that Ms. Reynolds cannot satisfy the predominance requirement, it need not address the superiority prong.

### D.    Collective Certification

The FLSA provides that "any one or more employees for and in behalf of himself or themselves and other employees similarly situated" may bring an action against her employer. 29 U.S.C. § 216(b). However, unlike a class action under Rule 23, in a collective action under the FLSA, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Individuals have to opt in to an FLSA collective action. *See Halle v. West Penn Allegheny Health Sys., Inc.*, 842 F.3d 215, 224 (3d Cir. 2016). District courts must determine if those who want to opt in are similarly situated.

The first step in this process is conditional certification, which requires a named plaintiff to make a "modest factual showing"—something beyond mere speculation— to demonstrate a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected the proposed collective action members. *Id.* (*citing Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 n.4 (3d Cir. 2012)). If a court grants conditional certification, the consequence is the "dissemination of court-approved notice to potential collective action members." *Id.* (*citing Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). Although not true certification, the Court exercises its discretionary authority to oversee and facilitate

the notice process. *See id.* Conditional certification is a unique process and "is not tantamount to class certification under Rule 23." *Id.*

### 1.    Certification

Ms. Reynolds has made the requisite factual showing for collective certification of her claims concerning untipped side work. Turning Point used the same payroll system to pay all of its servers. It paid servers using the same job code, regardless of what they were doing, and Turning Point took a tip credit for all of those hours. Turning Point required tipped employees to perform side work before, during, and after their shifts. Turning Point maintained a list of side work tasks that it expected each tipped employee to complete. Turning Point did not track the amount of side work that each employee performed each week. This evidence satisfies the modest factual showing of similarity required for conditional certification of a collective action about the side work.

Turning Point suggests that the inquiry about how much side work any employee performed is an individual one. That might be right. But this is not the time for that argument. Turning Point can challenge the certification after an opt-in period and after it has a chance to take discovery of any opt-in plaintiffs.

Ms. Reynolds has not made the requisite showing for her claims concerning notice of the tip credit, though. As Ms. Reynolds points out, Turning Point took a tip credit for all of its tipped employees, it subjected them to the same compensation policy, and it paid them the same minimum wage. But Ms. Reynolds has no evidence suggesting any similarity in the notice that tipped employees received about the tip credit. Although Turning Point used the same software to onboard new employees

and provide notice of the tip credit, Ms. Reynolds did not get notice from that system. Ms. Reynolds has no evidence of Turning Point onboarding other employees without that system or the notice that it provided. Turning Point also relied on managers to tell new employees about the tip credit. Ms. Reynolds did not get that notice from her manager. But she has no evidence about the substance of conversations that Turning Point managers had with other new employees to disclose the tip credit. She relies on suppositions about what managers might have told new employees, based on information that the managers themselves received. Conditional certification is not a high bar, but it is a bar that requires some evidence of similarity. Ms. Reynolds has none, and the Court will not just infer it. Ms. Reynolds has not cleared the bar for her claims about the notice.

### 2. Scope of certified collective

The evidence suggests that Turning Point's conduct with respect to side work requirements was similar at all of its Pennsylvania locations. It employed the same payroll practices at all of its locations. It had the same timekeeping policies. It had the same policies concerning the performance of side work. The Court therefore sees no reason to distinguish among the various Turning Point locations in Pennsylvania at this stage of the proceedings. Turning Point might develop evidence of differences between the locations for use in a decertification motion. But Ms. Reynolds' showing suffices to justify certification for all of the locations. Therefore, the Court will conditionally certify the FLSA class as: All persons that Turning Point employed during the last three years at any Turning Point Pennsylvania location for whom it utilized a "tip credit" in compensating the individual.

3.      **Notice issues**

Once a court grants conditional certification, the court has the discretionary authority to oversee and facilitate the notice process. *See Halle*, 842 F.3d at 224. This authority includes monitoring preparation and distribution of court-facilitated notice sent to potentially eligible members of the collective action. *See Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Ms. Reynolds has not provided her proposed form of notice. The Court directs the parties to meet and confer to find a mutually agreeable form of notice for the FLSA class. The Court cannot, at this stage, determine whether Ms. Reynolds should provide notice by mail, email, or both. That will depend, at least in part, on whether Turning Point has valid email addresses or current addresses for the members of the collective class. The Court will not require Turning Point to post notice in its restaurants. Posted notice would supplement direct notice to reach members of the certified collective who might not otherwise receive notice. But the people least likely to receive notice are those who no longer work for Turning Point, for whom Turning Point's information might be stale. Posted notice in the employee areas of the restaurants will not cure that problem, and the posted notice will be redundant of the direct notice.

Finally, the Court will direct Turning Point to provide data about the members of the collective class that includes both phone numbers and the last four digits of each person's social security number. The Court does not do so lightly. It recognizes that this information is personal. But the information that Turning Point has could well be out-of-date, and Plaintiffs' counsel will need additional personal information to perform skip tracing and locate members of the collective class to provide them with

notice. The Court will therefore order its production, on the understanding that Plaintiff's counsel will maintain its confidentiality use it only for limited purposes in this case.

## III.    CONCLUSION

Factual questions prevent the resolution of Ms. Reynolds' claims, but many of those factual questions also render the case inappropriate for class certification under Rule 23 or conditional certification under the FLSA. The Court will therefore deny both summary judgment motions and the motion for class certification. It will grant conditional certification as to side work issues but not notice issues, and it will give the Parties two weeks to try to resolve notice issues or to submit competing proposals. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
Hon. Joshua D. Wolson
United States District Judge

December 14, 2020